CAR–MAR CONSTRUCTION CORP., et al., Plaintiffs,

v.

Samuel K. SKINNER, Secretary of Transportation, et al., Defendants.

Civ. A. No. 88–1504.

United States District Court, District of Columbia.

Nov. 12, 1991.

James K. Stewart, Keith R. Anderson, Green, Stewart & Farber, Washington, D.C., for plaintiffs.

James R. Layton, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

### INTRODUCTION

Presently before the Court are the parties' cross-motions for summary judgment. This action was brought by plaintiffs Car–Mar Construction Corporation ("Car–Mar") and its sole owner, Carol Georgalas Pendleton ("Pendleton") against defendants Samuel Skinner in his official capacity as Secretary of the Department of Transportation, the United States, and the United States Department of Transportation ("DOT") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), *et seq.* The action was brought after DOT upheld the decisions of the Metropolitan Transportation Authority ("MTA") and the New York City Transit Authority ("NYCTA") to deny plaintiff Car–Mar's certification as a Minority Business Enterprise ("MBE"). Plaintiffs contend that DOT's decision violated the applicable provisions of the governing regulations found in 49 C.F.R. Part 23, the APA, and the United States Constitution.

For the reasons that follow, we deny plaintiffs' cross-motion for summary judgment and grant defendants' motion for summary judgment.

### BACKGROUND

Car–Mar is a New York business engaged in structural steel and precast erection and general construction which was incorporated in 1975 by three women: Pendleton, Marilyn Granton, and Mary Conley. AR at 987. Each woman invested $3,000 into the firm's capitalization. AR at 11, 165. In 1977, Pendleton secured a second mortgage for $10,000 on her house to provide additional capital for Car–Mar. AR at 36–37, 174, 1626–29. That mortgage was completely paid off in 1983. In 1980, Pendleton bought out her partners to become the sole owner. AR at 22–24, 154. Prior to her relation with Car–Mar, Pendleton

had no experience in the steel erection industry; she had worked strictly in administrative jobs. In contrast, Pendleton's husband, Robert Pendleton, had years of experience in the industry, working as a foreman and superintendent. AR at 458. Mr. Pendleton remains employed by Car–Mar as project manager for the company.

The United States Department of Transportation requires that recipients of DOT-funding provide for the participation of MBEs pursuant to agency regulations. See 49 C.F.R. Part 23. The regulations define MBE to include businesses owned and controlled by racial minorities, women, and socially and economically disadvantaged individuals.[1] See 49 C.F.R. § 23.5. Several state and local agencies in New York are recipients of DOT funds and are required to provide MBEs with the maximum opportunity to compete for and perform certain contracts. See, e.g., 49 C.F.R. § 23.45. The state and local agencies use the standards set forth in 49 C.F.R. § 23.53 to determine whether the firm is eligible to be certified as a MBE. Denials of MBE certification may be appealed to DOT. See 49 C.F.R. § 23.55.

The regulations require that the ownership and control of a business "be real, substantial, and continuing and shall go beyond the pro forma ownership of the firm as reflected in its ownership documents" 49 C.F.R. § 23.53(a)(2). The owner must "possess the power to direct or cause the direction of the management and policies of the firm and to make the day-to-day as well as major decisions on matters of management, policy, and operations." 49 C.F.R. § 23.53(a)(3). The regulations provide that if management power is contracted to other parties, those persons with the "ultimate power to hire and fire the managers" can be considered as controlling the business. 49 C.F.R. § 23.53(a)(4).

Car–Mar applied for MBE certification from NYCTA on February 25, 1986. On June 25, 1986, Pendleton appeared at a NYCTA eligibility hearing. On December 23, 1986, NYCTA denied plaintiffs' application. Car–Mar applied for MBE certification from the MTA on January 16, 1986, and Pendleton appeared at a MTA eligibility hearing on March 10, 1987. The MTA denied Car–Mar's application in a letter dated July 14, 1987. Pendleton was represented by counsel at both the MTA hearing and the NYCTA hearing. Plaintiffs appealed the denials of certification to DOT, which consolidated the cases, and on May 2, 1988, DOT affirmed the denials of Car–Mar's application.

The instant suit was brought on June 1, 1988. This Court dismissed the action without prejudice on September 8, 1988 as the parties had agreed to remand the case to the MTA and NYCTA for a de novo review. DOT remanded the case with directions to supplement the record. The agencies were directed to pay particular attention to whether Pendleton possessed the power to direct or cause the direction of the management and policies of the firm on a day-to-day basis and to make major decisions on matters of management, policy and operations. Additionally, they were to consider whether Pendleton's capital contributions were sufficient. See Letter from Hudson to Grier of September 29, 1988. On October 31, 1988, NYCTA and MTA held a remand meeting, during which time they examined Pendleton for approximately 5½ hours. The agencies followed that hearing with a site visit on November 3, 1988. In a letter dated December 9, 1988, MTA and NYCTA again denied Car–Mar certification as a MBE. On March 3, 1989, plaintiffs appealed this determination to DOT. In an 8–page letter received on April 3, 1989, DOT affirmed the denial of certification. The Department noted:

> In reviewing this matter, the Department agrees that Mrs. Pendleton is actively involved in the management of Car–Mar's affairs. In totality, however, the record reveals that her responsibilities as owner of Car–Mar are not significantly different from that of an office manager who performs primarily administrative tasks. . . .

---

1. The terms Disadvantaged Business Enterprise (DBE) and Woman-owned Business Enterprise (WBE) are also used. For consistency, this opinion will refer only to MBE.

While Mrs. Pendleton has gained some knowledge of the steel erection industry, her knowledge in comparison to that of Mr. Pendleton is limited. Mrs. Pendleton's participation in the firm primarily involves non-technical, non-critical areas. The record clearly reveals that Mr. Pendleton is the individual associated with the business who controls operational, managerial and policy decisions. MTA/NYCTA correctly concluded that Mrs. Pendleton "does not possess the wherewithal to ascertain if services are being performed in accordance with industry standards or controls." Therefore, it appears that Mrs. Pendleton is not able to intelligently use and/or critically evaluate information presented to her by individuals performing the delegated task of estimating and project management.

*See* Letter from Hudson to Stewart (undated) [hereinafter DOT Final Letter]. It is from this decision of the DOT that the instant suit appeals.

The first two counts of the complaint allege that defendants' final denial of certification violated the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (E), as it was unsupported by substantial evidence in the record and was arbitrary and capricious. Plaintiffs argue that the denial violated the federal regulations, 49 C.F.R. §§ 23.53, 23.55(b), as DOT allegedly did not undertake an independent or a *de novo* review of the MTA and NYCTA's December 9, 1988 remand decision. Further, plaintiffs argue that defendants have altered the existing regulations governing the eligibility standards for MBE certification without engaging in the rule-making procedure required by the APA. Finally, plaintiffs allege constitutional violations: that an MBE certification constituted a property right and thus that their Fifth Amendment right to due process was violated by the denial of certification; and that Pendleton's right to equal protection was violated because she ostensibly was treated differently from similarly situated women or minority owners of business enterprises.

The discussion will first address the APA requirements and then turn to the constitutional issues.

## STANDARD OF REVIEW

■ Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate when there are no genuine issues of material fact. Summary judgment is especially appropriate in cases such as this where the Court is called on to review a decision of an administrative agency. In these cases, what is often in issue are not the facts, but whether the agency erred in applying the law. *See, e.g.,* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2733 at 366–67 (2d ed. 1983). Decisions of administrative agencies are subject to review in federal court under a standard that examines whether the decision was arbitrary and capricious. *See Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); Administrative Procedure Act, 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." 463 U.S. at 43, 103 S.Ct. at 2866. A *de novo* review of the facts underlying the decision is not appropriate although the court must " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Motor Vehicles,* 463 U.S. at 43, 103 S.Ct. at 2866–67 (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *Cooperative Services, Inc. v. United States Department of Housing & Urban Development,* 562 F.2d 1292, 1295 (D.C.Cir.1977). The agency's interpretation of its own regulation is subject to a great deal of deference. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Transcanada Pipelines Ltd. v. Federal Energy Regulatory Comm'n,* 878 F.2d 401, 411 (D.C.Cir.1989); *Stuart–James Co. v. Securities & Exchange Commission,* 857 F.2d 796, 800 (D.C.Cir.1988), *cert. denied,* 490

U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1002 (1989).

Under such an approach it is clear that DOT's affirmation of the MTA and NYCTA's denial of MBE certification must stand. The essential issue in this case is whether the Department of Transportation acted arbitrarily and capriciously in determining that Pendleton's ownership was not real, substantial, or continuing as required by 49 C.F.R. § 23.53(a)(2) and in determining that she did not possess the power to direct or cause the direction of the management and policies of the firm or to make day-to-day as well as major decisions on matters of management, policy, and operations as required by 49 C.F.R. § 23.53(a)(3).

DOT found that Pendleton did not have sufficient experience to effectively control the day-to-day operations. It based this determination on the facts that at the formation of the company, she had no experience in the construction industry, and that in the intervening years she had not taken any courses in any area of construction or related fields. *See* DOT Final Letter, at 3. Further, DOT recalled that plaintiff Pendleton cannot read structural drawings or perform estimates for projects; that she cannot determine if figures given to her by the estimator are competitive and that she is not competent to question their decisions; and that she cannot recognize, evaluate, or solve technical problems. *See* DOT Final Letter, at 3–4. DOT also found it important that "the individual associated with Car–Mar who possesses the essential background and expertise to control critical operational decisions (estimating, bidding, field supervision, etc.) is not Mrs. Pendleton; but her husband, Robert Pendleton." *See* DOT Final Letter, at 4.

It is impossible to say that DOT acted arbitrarily or capriciously in this instance. DOT's conclusion is supported by the record. Pendleton admits much of what DOT states.[2] The plaintiffs do not dispute

these *facts:* rather they dispute their importance to a determination of control. But the agency has considerable discretion to determine what constitutes the appropriate level of operation and control. Nor is it unreasonable for an owner who would like to benefit from MBE status to be required to know about the technical nature of construction, or at the least, to be able to question the results reached by experts.

This case is remarkably similar to *Lane and Clark Mechanical Contractors, Inc. v. Burnley*, No. 88–4524, 1990 WL 50509, 1990 U.S. Dist. Lexis 4662 (E.D.Pa. April 19, 1990). In that case, Patricia Santos–Lane was the owner and sole shareholder of Lane and Clark Mechanical Contractors, formed in 1978 by her husband Daniel Lane and Charles Clark. Patricia Santos–Lane became owner in 1983 when her husband gave her his shares for no consideration and Mr. Clark sold his shares to the company under a redemption agreement. Daniel Lane was terminated by his wife shortly before the application for DBE certification. DOT upheld the Southeastern Pennsylvania Transportation Authority's denial of MBE certification, finding that Santos–Lane did "not possess the power to direct or cause the direction of the management and policies of the firm and to make the day-to-day as well as major decisions on matters of management, policy, and operations." 1990 WL 50509, *4, 1990 U.S. Dist. Lexis 4662, *9. DOT also found that non-minority owners were "disproportionately responsible for the operation for the firm." *Id.* Santos–Lane functioned primarily as an office manager for the firm, the agency found, as she lacked the requisite technical knowledge in the heating, ventilating, and air conditioning areas.

In *Lane and Clark*, the court found that the agency's determination that Santos–Lane lacked sufficient technical expertise to control the day-to-day and major decisions of the firm was a valid interpretation

---

2. For example, Pendleton admits that she cannot do a takeoff from structural drawings, AR at 1061, although she indicates that she is familiar with the drawings. *Id.* She said that she can put a price on the job after the takeoff estimate is completed, but that she relies upon Mr. Pen-

dleton and the job superintendent to perform the takeoff and she does not have the ability to question their technical estimates. *See* AR at 1062–63. She further said that Mr. Pendleton was the project manager for all of Car–Mar's jobs. *See* AR at 1077.

of 49 C.F.R. § 25.53(a)(3). The court stated: "The DOT interpretation of § 25.53(a)(3) is reasonable and reflects a common sense approach to the control and management of firms operating in technical fields. In essence, the DOT interpretation reflects the realistic assessment that, in a technical field, a qualified manager will necessarily possess certain specialized knowledge of the field." 1990 WL 50509, *6, 1990 U.S. Dist. Lexis 4662, *15. *See also Whitworth–Borta, Inc. v. Burnley*, No. G87–176, slip op. at 7, 1988 WL 242625 (E.D.Mich. June 28, 1988) (Bell, R., J.) ("The term 'control' is of necessity indefinite and flexible, enabling the Department to exercise reasonably broad discretion in assessing the facts and circumstances of each application. It is certainly broad enough to permit consideration of Mr. Whitworth's lack of engineering expertise as *one* factor in determining the extent of his actual control of an engineering consulting firm which is, in important respects, co-managed by two licensed engineers.")

We agree with this analysis.[3] It is not unreasonable to interpret the requirement that the owner's control be "real, substantial and continuing" as imputing some technical knowledge to the owner. Rather, technical knowledge seems vital for a construction company: without such skills, an owner would be unable to judge the competence of her employees and would be unable to gauge the viability of projects. While this Court conceivably might have reached a different conclusion had it reviewed Car–Mar's application in the first instance, such is irrelevant. This is because DOT's interpretation is a reasonable interpretation of the regulations and the agency's interpretation is controlling. Thus, plaintiffs' argument that the agency's determination was arbitrary and capricious must fail.

Pendleton maintains that DOT's focus on her husband is inappropriate; that she controls the company because she maintains the complete power to terminate his employment at any time. As support, plaintiff points to a seeming inconsistency within the regulations: that 49 C.F.R. § 23.53(a)(4) explicitly permits the "contracting" of certain managerial operations so long as the owner retains the ability to terminate employment. This she argues is the regulation that controls her relationship with her husband as her employee. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 21.

Plaintiffs' argument has some merit. However, as noted above, the agency's interpretation of its regulations is controlling "unless it is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff*, 431 U.S. 864, 877, 97 S.Ct. 2150, 2158, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). It is not inconsistent that the owner should be allowed to contract with managerial employees and yet still require a base level of technical knowledge of the industry. The ability to hire and fire rests on the owner's ability to gauge the effectiveness of those to whom operations are contracted. For the agency to require some technical knowledge is not plainly erroneous nor inconsistent with the regulations. In its instructions to MTA/NYCTA on remand, DOT addressed this issue:

> Consistent with these requirements, a woman or minority owner of a firm may delegate functions to employees. Owners can—and often, they must—rely on the judgments of managers and other staff members. In and of itself, the race or sex of the managers and other staff members whose judgments are relied upon is not a controlling factor with respect to making a DBE eligibility determination. What is important, however, is that the owner have sufficient background and expertise at the present time with respect to the delegated aspects of the business to be able to intelligently use and critically evaluate information presented by managers and other staff members in making decisions concerning

---

**3.** The *Lane and Clark* case also indicates at least anecdotally that the agency has not treated Pendleton with different rules than other petitioners.

the daily operational activities of the business.

Letter from Hudson to Grier of September 29, 1988, at 2. The regulations also specifically state that the agency should view relationships between the employees and employers carefully.[4]

■ Plaintiffs complain that DOT was obligated to conduct a *de novo* review of the denials of MBE certification and that its denial of a *de novo* review and an evidentiary hearing was arbitrary and capricious. Simple analysis shows this position to be untenable. First, the regulation at issue does not require a *de novo* review; by its terms the regulation calls for a "prompt investigation." *See* 49 C.F.R. § 23.55(b). DOT is not required to conduct a *de novo* review by either the Title VI procedures or the DOT's regulations. *See* Declaration of William T. Hudson, at 3. Second, in their pursuit of MBE certification, plaintiffs were afforded three evidentiary hearings (one initial hearing before each agency and then a remand hearing). A tremendous number of documents were submitted and a good deal of government resources were consumed. There is no reason to believe that a *de novo* review or another evidentiary hearing would provide any additional useful information. Since the DOT acted responsibly and within the letter of its regulations, it did not act arbitrarily or capriciously in performing its review of the remand proceedings.

■ Plaintiffs also allege that defendants have altered the existing regulations governing the eligibility standards for MBE certification without engaging in the rule-making procedures required by the APA. Plaintiffs allege that DOT effectively replaced the term "power" in 49 C.F.R. § 23.53(a)(3) with "sufficient technical background and expertise" and eliminated the remainder of the section. *See, e.g.,* Memorandum in Support of Plaintiffs' Cross–Motion for Summary Judgment at 36–37. As we have already discussed, defendants followed a reasonable interpretation of their regulations, including the questioned section. They did not alter the regulations and therefore, this argument cannot succeed.[5]

## CONSTITUTIONAL ISSUES

Plaintiffs' constitutional claims are also without merit. Plaintiffs allege that MBE certification constitutes a property right, and that its denial was a violation of their Fifth Amendment right to due process. They also claim that Pendleton's right to equal protection of the law was violated because she was treated differently from similarly situated women or minority owners of business enterprises. These claims do not survive scrutiny.

■ There was no violation of Pendleton's due process rights by DOT's denial of MBE certification. Pendleton may have a limited property right in MBE certification, an issue which we need not reach. However, even assuming *arguendo* that there is some property interest, plaintiffs received more than adequate process prior to the denial of certification.

The procedure required by due process is determined by a weighing of the private interest involved, the risk of an erroneous deprivation of such interest, the probable

---

4. *See* 49 C.F.R. § 23.53(b)(2).

5. In this count of the complaint, plaintiffs also allege that DOT *de facto* eliminated the remainder of the section, which refers to formal and informal restraints on control by the minority owner. There is no support for this assertion. In the case at bar, there are none of the formal or informal restraints discussed in the section and hence that sentence is merely not applicable; it has not been deleted. Plaintiffs also allege that DOT has effectively deleted the provision in 49 C.F.R. § 23.53(a)(4) that permits the contracting out of management. As discussed above, while there is some merit to plaintiffs' contention, there is no reason to believe that this provision no longer remains in force. This provision was not at issue *in this case*. Similarly, plaintiffs allege that DOT imposed a new eligibility requirement: that an employee may not have an "atypical" employment relationship with the firm. This argument is unpersuasive: the fact that Pendleton relies upon her husband for much of the technical estimates and is without the ability to independently question his results is a factor in DOT's analysis that she does not have sufficient control. The position of her husband as her husband was not the exclusionary factor.

value of additional procedural safeguards, and the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The private interest at issue here, the right to be considered for certain government contracts, is not nearly as great as other interests where the courts have found due process rights. For example, the right to certification as a MBE does not rise to the level of the right to subsistence payments, *see Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the right to social security payments, *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), or even the right not to be fired from a government job without cause, *see Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).[6]

The right asserted in this case is to be weighed against the process provided. As the record indicates, plaintiffs were provided with a hearing with counsel before the MTA and the NYCTA, and were permitted to appeal their decisions to DOT. At both levels a written opinion was delivered. In this case, plaintiff's application went through a second *de novo* hearing at the state level and subsequent review by DOT. Again, plaintiffs were represented by counsel and Pendleton was permitted to give testimony. Plaintiffs received more process than that which the Supreme Court required in the aforementioned subsistence cases. If this is not sufficient process, we can not imagine what would satisfy plaintiffs.

The risk of an erroneous deprivation under such a procedure is slight. DOT had the benefit of an extensive administrative record where plaintiff Pendleton was accompanied by counsel. Requiring two *de novo* trials is ludicrous: there is no reason that DOT should not be permitted to review the record of the agency's determination for error. A second evidentiary trial would cost the government resources to protect what is at best not a very important property right. *Cf. Town Court Nursing Center, Inc. v. Beal*, 586 F.2d 266, 278 (3d Cir.1978) (*en banc*) ("the public interest in conserving scarce financial and administrative resources is strong"; rejecting pretermination hearings for nursing homes participating in Medicaid). Plaintiffs received more than adequate process in this case.

■ The equal protection claim also fails.[7] Equal protection might support the claim that Pendleton, as a woman, is being treated differently from male applicants; however, it does not support an argument that Pendleton is being treated differently

---

6. Not all government employment creates a property interest. A property interest in employment is recognized only if there is a "legitimate claim of entitlement." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *see, e.g., Lyons v. Barrett*, 851 F.2d 406 (D.C.Cir.1988) (executive assistant in government printing office did not have property interest in job where he served solely at pleasure of public printer); *Twist v. Meese*, 661 F.Supp. 231 (D.D.C.1987), *aff'd* 854 F.2d 1421 (D.C.Cir.1988), *cert. denied* 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989) (Department of Justice attorney who was terminated for whistleblowing lacked statutory entitlement to position and did not state a claim for violation of due process); *Frazier v. University of District of Columbia*, 742 F.Supp. 28 (D.D.C.1990) (head football coach who was at-will employee had no property interest since job was not for a definite period of time).

7. Plaintiffs argue that summary judgment for the defendants on this issue would be inappropriate as plaintiffs set forth a *prima facie* case on their equal protection claim and the defendants did not carry their burden to demonstrate that there exist no material facts in dispute. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 40–41. However, we note that by its clear terms, Federal Rule of Civil Procedure 56 does not require defendants to supply affidavits. *See* Fed.R.Civ.P. 56(b) ("A party against whom a claim, counterclaim, or cross-claim is asserted ... may ... move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Further, the Advisory Committee notes indicate that an adverse party's reliance on its pleadings is not necessarily sufficient. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *See* Fed.R.Civ.P. 56 Notes of Advisory Committee on Rules 1963 Amendment Subdivision (e). As we find that the plaintiffs have not even made out a *prima facie* case, summary judgment for defendants is appropriate.

from other female MBE applicants. Plaintiffs argue that DOT's denial of certification was intentional, differential treatment based on sex. *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 40. However, this argument begs reason: only women and minorities are even eligible for MBE certification; consequently, Pendleton's denial cannot be based on her sex. Plaintiffs admit that summary judgment is appropriate where plaintiffs put forward no evidence tending to establish discriminatory intent, *see* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 41. In this case, we can see no evidence that establishes discriminatory intent. Consequently, we grant summary judgment on the equal protection claim.

For the reasons given above, plaintiffs' cross-motion for summary judgment is denied and defendants' motion for summary judgment is granted.